[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
By petition filed in the Bristol Probate Court on June 28, 1989, Deborah A.D. seeks to terminate the parental rights of Mark C., legal and biological father of Mark R., born October 3, 1985, on the grounds of abandonment and denial of necessary care, two of the three nonconsensual grounds for granting such relief as provided by subsection (f) of Sec. 45-61f, Conn. Gen. Stats. (Rev. 1989), applicable to children not previously committed to the Department of Children and Youth Services (DCYS). On the date of filing, a hearing was set for 30 days thereafter as mandated by subsection (a) Sec.45-61 (d), but simultaneously such hearing was "continued until further order of this court . . . . the court having ordered an investigation and report" pursuant to Sec. 45-61 (d) and (f). DCYS was requested to conduct an investigation, as provided by subsection (c) of Sec. 45-61f, on July 10, 1989 with a due date of October 10, 1989.
Notwithstanding the requirement of Sec. 45-61f(e)(2) that where ". . . such report has been requested. . . the court shall set a day not more than 30 days thereafter" [Emphasis added], no hearing was held in November of 1989. Instead, the respondent father, on December 6, 1989, filed a motion to transfer the matter to this court pursuant to subsection (g) of Sec. 45-61c, and the next day the motion was granted as a matter of right.
The parties were re-served for the initial hearing in this court held on January 10, 1990, at which time the petitioner's oral motion to add a third nonconsensual ground for terminating the father's parental rights (absence of ongoing parent-child relationship and unlikelihood of establishing one within a period consistent with the child's best interests) was granted over his objection. A psychological evaluation was ordered on the mother's motion, with costs to be shared between the petitioner and the child's court-appointed counsel. The DCYS study, due October 10, 1989, was received by this court on January 24, 1990 (Petitioner's Exh. F.). The respondent's motion to strike one of the pleaded grounds (denial of proper care by acts of parental commission or omission) was denied, leaving the petitioner free to present evidence as to the father's conduct toward the child prior to the entry in July of 1986 of a Family Relations judgment denying him all visitation rights in connection with the CT Page 3828 dissolution of the parents' marriage. Since no objections were raised by any party as to those proceedings in the Probate Court which appear to be at variance with provisions of the applicable statutes, they are deemed to have been waived.
Trial was conducted on three nonconsecutive days following receipt of the psychological evaluation, concluding on July 18, 1990 when all parties rested and were given until September 19, 1990 (extended by request of counsel to September 26, 1990) for the submission of trial memoranda.
Facts
Evidence offered at trial supports the finding of the following facts:
In the spring of 1984, two months after twenty-year old Deborah met Mark C. who, although only a year her senior was already divorced from his drug-abusing first wife, they began to live together. By the summer of 1984 Mark C. had begun to use cocaine, a cause of numerous altercations between them. After being struck by him in one of their fights, Deborah considered having him arrested, but decided instead to return to her parents' home. Three months later, in November 1984, being assured by Mark C. that he was now free of drug abuse, she returned to live with him. Shortly after she learned she was pregnant, Deborah began to suspect his resumption of drug use. Nonetheless, they married in June of 1985 with the support of her parents who gave them a wedding and provided much of the furnishings for their apartment. The parties continued to argue after their marriage over both drugs and money, leading, one one occasion, to a violent outburst by the respondent that resulted in his slashing a new piece of upholstered furniture with a long sharp object.
In early October of 1985, nearly a month before Mark R. was due to be born, another violent altercation occurred after the respondent came home at 4 a.m. When his wife, who had waited for him, asked where he had been, he became so angry that he choked her. The baby was born prematurely the next day and had to remain for a short time in the hospital after the mother's discharge.
The fighting between the parents resumed soon after their baby was brought home. While the father assisted the mother in all aspects of child care for the first week, by late October physical violence recurred. On one occasion when Deborah had picked the baby up to feed him, the respondent struck her on the side of her head with his closed fist. Soon after this he was fired from the job her father had secured for CT Page 3829 him after being found on the floor of his place of employment, overdosed from what he later testified had been a combination of cocaine and grain alcohol. He was then using alcohol to ease the abrupt transition from cocaine "highs". Later, when Deborah returned from visiting her family, Mark C. struck her in anger for failing to leave him with cigarettes during her absence and various other times during the baby's first month, he broke household objects and threatened to choke a friend of the mother.
On November 8, 1985, a month after bringing the baby home, Deborah again returned to the home of her parents. This time the separation from Mark C. was permanent. The following month Mark C. went to jail for the first time (Respondent's Exh. 2) and Deborah filed for divorce. Petitioner's Exhibit A establishes that he was personally served in this action by the sheriff on December 14, 1985. On a visit soon after initiation of the divorce action, when Deborah refused to leave her parents' house to go out with him, her mother heard him say, "If I had a chance to take the baby, you'd never see him again." (Testimony of maternal grandmother, June 6, 1990.)
Mark C. appeared in Family Relations court without counsel on February 18, 1986 and agreed that pendent lite Deborah would have temporary custody of their child while he could visit every Sunday for two hours, provided only that he telephone in advance to confirm the visit. In the ensuing five months between the entry of these orders and the date of the final judgment in the dissolution action (Petitioner's Exh. B), out of 22 possible weekly visits with the child, the respondent came no more than six times. While he had been incarcerated for approximately seven weeks of this period (Respondent's Exh. 1), the only reason given for his failure to visit for the other Sundays when free to do so was his fear of being arrested. None of the warrants for which he was avoiding arrest resulted from complaints made by the petitioner or any member of her family. Each time he called ahead for a visit pursuant to the pendente lite orders, he was permitted to see his son. He had never stayed the full two hours, usually leaving after approximately one half hour during most of which time he attempted to talk to his wife rather than interact with the child. At all visits both Deborah and some member of her family were present, a circumstance which made him uncomfortable but which he made no legal effort to change. During the visits that did occur, he avoided all physical care of the child: Deborah testified that on one visit when asked to change the baby he declined, saying "No, you're his mother. You know best." Another time when offered the opportunity to CT Page 3830 feed the baby, he responded, "No, I'll watch." (Testimony of petitioner, May 9, 1990.)
Six days before the date scheduled for the dissolution action to be heard in Family Relations, Mark C. told his wife that she would not be able to proceed with the divorce if he failed to appear, and he did not intend to be present. On July 18, 1986 he did not, in fact, appear. The court, however, (Kremski, J.), having found that ". . . the defendant . . . has actual notice of these proceedings," Petitioner's Exh. A, p. 2) granted the dissolution and denied the father all rights to visit the child ". . . due to his physical abuse of the plaintiff and his involvement with drugs." (Ibid.) The decree also restored to the mother her maiden name of Deborah R.
Two days after the divorce, the respondent called for his Sunday visit. When the mother informed him of the court's orders, he accused her of lying, expressing doubt that the matter could have been resolved in his absence, and his intent to secure a lawyer to bring the matter back to court. In his own testimony, Mark C. recalled speaking with the mother's attorney in the dissolution action and expressing his intention to secure counsel for this purpose. In fact, he never did so. Instead, he made a few telephone calls in which he threatened to kill the petitioner and to kidnap their son. After several of such calls and his being observed driving past the house a number of times, the maternal grandmother called the police, but there was no evidence that this resulted in an arrest.
In the absence of any financial support by the respondent, for fifteen months after filing for divorce Deborah was a recipient of AFDC with which she supported the child. In March of 1987, however, she had completed her education and began working. The respondent learned of her employment, and after he had telephoned her there and came to her office on a number of occasions, Deborah asked her employer to inform him that she no longer worked there.
In July of 1987 she filed a petition in the Probate Court to change her son's last name to conform with hers, testifying that she had come to associate her married name only with drugs, crime, imprisonment and welfare. (Petitioner's testimony May 9, 1990.) The respondent was notified by regular mail sent to 18 Water St. in Southington on July 27, 1987. (Petitioner's Exh. C). Although he later testified this address was incorrect, two days before the hearing scheduled on the name change, Mark C. called his former wife from Florida to ask to have the hearing postponed. He told her his mother had received the notice, opened it and called him. Deborah refused to postpone the hearing but suggested that he call the probate CT Page 3831 court, secure an attorney to request a continuance, or send a member of his family to the hearing to request a postponement. He did none of these things. On August 1, 1987 the child's last name was changed from "C." to "R.".
Although the respondent testified that he was unaware of the no-visitation order contained in the final dissolution decree, at no time after July of 1986 did he make any effort to exercise what he understood to be his continuing right to visit every Sunday. If, however, as the petitioner testified, Mark C. had been informed two days after the decree prohibiting visitation, he made no effort to change it. Instead, three months after the divorce, he called Deborah to ask for a copy of the divorce decree since his girlfriend at the time wanted proof that he was divorced. Although he testified he did not know her address and feared that her parents would not give her letters from him sent to their house, she did, in fact, receive four or five letters from him. He then admitted that he had been involved in an armed robbery which had netted the participants $300,000. In none of his letters or phone calls did he ask about the child's welfare, although on one occasion he asked for pictures of the child. The petitioner replied that if he would send her a role of film, she would return it with pictures of the child. He never did so.
Two years after the parties divorced, in November of 1988, Deborah remarried. At the same time Mark C. was sentenced to 20 years, suspended after ten, for his participation in an armed robbery.
Young Mark R. had met Joseph D., his stepfather, more than two years before his mother remarried. During this period, Mark R. developed a close relationship with Joseph D. who helped the mother financially and participated in every aspect of the child's care. By the spring of 1987 when he was 18 months old, the child spontaneously began to call Joseph D. "Daddy" and has done so ever since. When evaluated by the court-appointed psychologist (Petitioner's Exh. G), the stepfather was as much the child's psychological parent as was the petitioner.
From the time of the parties' separation in November of 1985, none of the father's relatives made contact with Deborah, sent mail or gifts, or accompanied Mark G. on his few visits with the child. While Deborah had moved out of her parents' home in October of 1987 and requested them to withhold her address from the father and his family, her parents have not moved from that address and have transmitted to Deborah all mail sent to her there. No mail was ever received from any of the respondent's relatives. In May of 1989, however, one of CT Page 3832 the paternal aunts chanced to see Deborah on the street with Mark R. She followed them home to learn their current address and gave this information to her sister who wrote to the petitioner requesting a visit with the child. Deborah did not respond to this letter. A month later she instituted this action, and seven months thereafter, in January of 1990, gave birth to the first child of her second marriage, a son who is the half-brother to Mark R.
In his prison interview with the social worker assigned to conduct the court-ordered DCYS study, the respondent asserted his ignorance of the court date when his marriage had been dissolved, the provision in the divorce decree denying him all visitation, and of the probate court date for changing his son's name. While he did not contemplate ever seeking the child's custody, he opposed the name change, intended to seek an appeal of it, and opposed termination of his parental rights because he wanted his son to bear his last name and eventually come to know his biological father.
At the time of testifying, Mark C. was in maximum security, participating in Narcotics Anonymous, and anticipating supervised home release in 1991. A transfer to the minimum security facility at Enfield had previously aborted following a fight with corrections staff. He had continued drug use until his current incarceration began in November of 1988 but has discontinued all substance abuse since that time.
The respondent first testified that he had not learned that he was divorced until the DCYS social worker informed him in her prison interview conducted in connection with the court-ordered study; later he testified recalling a conversation with Deborah's divorce lawyer a week after the divorce had been granted in which he expressed his intent to hire a lawyer and "go for visitation". He denied striking his former wife "except in self-defense", distinguishing between deliberate acts of violence and physically restraining her from leaving the apartment which he admitted doing repeatedly: "Any time she said she was leaving I restrained her by anything short of hitting her." (Testimony of respondent, July 6, 1990). He acknowledged his failure to visit since the spring of 1986. his loss of employment, criminal activity and incarcerations, all of which he ascribed to his substance abuse: "Drugs controlled my life." (Ibid.) His penchant for at least verbal violence, however, appeared undiminished by his two and a half years of enforced sobriety: Referring to the visit of the DCYS social worker to him in prison, he stated, "I wanted to throw her out of the prison," because she had listened to him "in a rude way." CT Page 3833
His plan upon release from prison was to work as a restaurant bar manager. Asked if that was a wise choice for a recovering addict he replied, "Maybe not. I'd have to think about that." He planned to get established after his release in 1991 before initiating acquaintance with his son who, in 1992, would be seven. While acknowledging meeting his biological father at that age would be "scary for him", in his opinion the child would adjust: "We're all human. We can adapt to anything." Asked if he had considered whether adoption by the stepfather might be the best situation for Mark R., the respondent replied, "I never really thought about that." He did not explain how visitation with his son might come about, even if his parental rights were not terminated, considering the existing order of no visitation that had been entered four years earlier. Asked if he would seek drug treatment upon his release, he first stated that if his family wanted him to go into it, "so be it." Later he testified that he needed to be in inpatient treatment for six months following his release from prison.
In his court-ordered evaluation conducted at Somers, clinical psychologist Dr. Bruce Freedman found the respondent cooperative, intelligent, and honest about matters that were objectively irrefutable (e.g. his drug use and criminal activity) but not about matters to which only the parties had been witnesses (e.g. domestic violence between them; his awareness of various legal proceedings). (Testimony of Dr. Freedman June 6, 1990.)
 However, although Mark was honest about his drug abuse and criminal activity for the most part, when this was removed from his account of the past, there was little else left. In particular, there was little account of his role as a father, his attachment to his son, or evidence of his interest in his son . . . until his current objection to termination proceedings, there is no evidence of any sacrifice, contact or love demonstrated in his past role as a father. (Petitioner's Exh. G. p. 2.)
Dr. Freedman concluded that there was "little to recommend him as a father." (Ibid.) in contrast to the stepfather who was perceived ". . . without a doubt the psychological parent to Mark in every way. He showed excellent interaction and is and would continue to be an excellent father for Mark in the future." (id., p. 5.) Dr. Freedman saw no need for an interaction session between the child and his biological father whose last contact had been when the child was nine months old: CT Page 3834
 Considering the background, the content of the interviews and the lack of history between Mark and Mark Jr. it was felt that the potential confusion and disruption to Mark Jr. was not warranted based on the evidence." (Id., p. 6)
Dr. Freedman recommended termination of the respondent's parental rights "in order to reduce the chances of detrimental effects upon the life of Mark Jr. . . Aside from his part in conceiving Mark Jr., Mark C. did nothing else constructive, and many destructive things in his roles as father, as a husband, and even as a post-divorce father. Termination of parental rights seems the best course of action to protect Mark Jr. from interference in his life and from the further destructive influence of his biological father." (Id., p. 6-7).
In his testimony of June 6, 1990, Dr. Freedman observed the absence of any evidence in the past 7 to 8 years that Mark C. had ever lived as a "responsible adult outside of institutions" and expressed doubt that he "could hold it together outside of prison". Apart from the problem of substance abuse, the father's emotional problems made it hard for him to delay gratification or handle frustration. The psychologist concluded that whatever advantage there may be in Clark R. becoming acquainted with his biological father is "far outweighed" by the predicted detriment to him in terms of confusion and upset in an otherwise well-adjusted life in a family where two psychological parents were meeting all of his emotional needs. The fact that a psychiatrist had observed Mark C. interacting appropriately with a seven year old niece (Respondent's Exh. 1) with whom he was well acquainted in no way affected this conclusion. In Dr. Freedman's opinion, the respondent had done nothing during the child's life "to earn the privileges of parenting." Terminating his parental rights was necessary to prevent his interference and possibly destructive influence on the stable, emotionally secure life that the petitioner had provided for him. Suddenly learning that Joseph D. was not his "daddy", that a visiting stranger — albeit a well-behaved one — was his "real" father ". . . would shatter him." There would be no benefit and only potential detriment to Mark from being introduced to other members of his biological father's family, especially over the strong objections of his custodial parent. On the other hand, Dr. Freedman foresaw no detriment to Mark from being cut off legally — as he had been de facto for years — from such contact. Dr. Freedman found it noteworthy that at no time in his interview did the father express any feelings for the child, any sense of loss or desire to begin a personal relationship, expressed no goals or hopes for the child. Introduction to this father under all of the prevailing CT Page 3835 circumstances would "send the child reeling"; the disruption of his secure world would be "shattering". Even considering all variables most favorably to the father — that he could maintain sobriety and stability for a minimum of a year after institutionalization — introduction to his son as his "real" father would be "extremely disruptive" and "would create whole set of problems" for the child, and in light of the father's history of the past eight years, the chance that he could achieve such a favorable outcome was "pretty slim" which Dr. Freedman defined as less than even.
The respondent engaged Dr. Richard Sadler, psychiatrist, to conduct a prison interview with himself and a niece (Katie) about the same age as Mark R. Dr. Freedman found their interaction appropriate, except when the respondent told the child that the interview "involved his attempt to keep his ex-wife from `taking Mark, Jr. away from me.'" The niece appeared to feel comfortable with him throughout a 40-minute interview reflecting "a combination of Katie's mother's attitude toward her brother as well as Katie's relationship with adults in general as well as her specific interpersonal relationship with Mark C." (Respondent's Exh. 1, p. 4) Dr. Sadler was not called as witness.
Conclusions of fact:
1. Prior to the birth of Mark R. the father was repeatedly physically violent toward the mother, the last occasion occurring on the night before the child's premature birth. 2. While the respondent assisted the mother in child care appropriately during the first week the child was home, thereafter he played no constructive role in child care and continued the pattern of physical and verbal violence toward the mother for the next three to four weeks during which he resided with the child. 3. Mark R. saw his father no more than six times between the ages of one month and nine months; he has not seen him at at all since the age of nine months. 4. While ascribing his admitted failure to participate in the child's life (through visits, financial support or in any other way) entirely to his drug problem, the respondent did nothing to address that problem until he was incarcerated shortly after his son's third birthday. 5. That the respondent's problems are emotional as well as drug related is demonstrated (1) by his denial of any propensity to violence while serving a 20-year sentence for armed robbery and (2) by his admitted failure to consider any benefit to the child from being adopted by the only "Daddy" he has ever known, and his minimalization CT Page 3836 of the emotional impact on the child of being introduced to his "real" father at the age of seven. 6. The probability of Mark C.'s recidivating after release from prison is greater than 50%. Even if he were to defeat these odds and put his drug use permanently behind him, it would be at least two years before he would be in a position even to initiate a visiting relationship with his son. To do so at that time would have a negative effect upon the child's emotional stability. 7. The petitioner has at all times acted responsibly and decisively in her effort to secure for her son a stable and nurturing environment. 8. In Joseph D. the child has a second psychological parent as a fully involved with every aspect of constructive child care as is his mother. Mark R. has no physical or emotional need for a third parent who, by his own actions, removed himself totally from all but the first month of the child's first four years of life.
Adjudication: As of January 10, 1990 when the petition was last amended
This record supports by clear and convincing proof all three grounds pleaded for terminating the respondent's parental rights:
(1) Abandonment: The evidence is clear and convincing that prior to the entry of the divorce decree in July of 1986, the few visits Mark C. paid to his son did not constitute a manifestation of any "reasonable degree of interest, concern or responsibility as to the welfare of the child" within the definition of abandonment found in Sec. 45-61f. The excuses offered for the failure to exercise his right to weekly two-hour visits pendente lite are insufficient to defeat this conclusion: His incarceration for part of this five-month period was due to his own voluntary action in violating the law. His fear of arrest on valid warrants is not an acceptable reason for a parent's failure to develop at least a visiting relationship with a child not in his custody. Since July of 1986 Mark C. was barred all visitation by order of the court in the final divorce decree. Such orders are, however, subject to modification at any time. Sec. 46b-56 (a). The no-visitation order was clearly based upon the record to that date of drug abuse and physical violence; Mark C. was free to address these problems and return to court for reinstitution of visitation on the basis of changed circumstances. Instead, he left the state for periods of time, accelerated the seriousness of his criminal activity, and continued to abuse drugs and alcohol until his present incarceration began more than two years after CT Page 3837 the divorce. This pattern continued the lack of manifested "interest, concern or responsibility as to the welfare of the child" that preceded the final divorce decree. In the subsequent eighteen months preceding the institution of this action in the probate court in June of 1989, Mark C. was incarcerated in Connecticut where he had access to free legal counsel through Legal Assistance to Prisoners. He made no effort, however, to locate his son or to attempt, in view of his new sobriety, resumption of visitation. It was not until after a chance encounter on the street by his sister in May of 1989 that his family manifested any interest in the welfare of the child. At no time in the three years preceding the institution of this proceeding did Mark C. contribute, or attempt to contribute, anything in the way of supporting the child. At no time did he consult counsel as to his rights as a noncustodial parent. Even now, in contesting the termination of his parental rights, his expressed concern is not his son's welfare but rather the importance of the child's bearing his biological father's last name. The fact of incarceration does not per se constitute abandonment, but neither does it preclude such finding. In Re Juvenile Appeal (#1-155) 187 Conn. 431
(1982). The record as a whole in this case supports by clear and convincing evidence a finding of abandonment as grounds to terminate the parental rights of Mark C. within the statutory definition.
(2) Acts of commission and omission: The respondent only lived with the child in question for a month after birth, but had cohabitated with the mother during the entire period of her pregnancy. Had this action been commenced at the time of their separation in November of 1985, the actions of Mark C. in striking his wife during the late stages of pregnancy, including the night before the child's birth, in engaging in physical altercations with her when the child was a newborn, in keeping her a prisoner in their apartment by the admitted use of physical force, in failing to participate in any aspect of child care after the baby was a week old, and in voicing on more than one occasion threats of physical harm and/or abduction of the child, taken together constitutes clear and convincing proof of "acts of parental commission or omission" resulting in a denial of "the care, guidance or control necessary for his physical, educational, moral or emotional well-being" within the meaning of subsection (f) of Sec. 45-61f. There is no evidence of child abuse, which under that section would constitute' "prima facie evidence of acts of parental commission or omission sufficient for the termination of parental rights", but this nonconsensual ground is not confined to that limited basis for termination. The evidence is overwhelming on the instant record that by both acts of commission and omission, this father denied his son the "care, CT Page 3838 guidance or control necessary" for his well-being.
Whether this ground is lost by the passage of time is an issue not yet addressed by the courts of this state. Subsequent to his parents' separation in November of 1985, little Mark R. was not denied necessary care, guidance or control due solely to the responsible actions and decisions of his custodial mother. Had the father returned to the child's life in a constructive way, exercising those parental rights reserved to noncustodial parents without detriment to the child, the existence of this ground in the distant past might then have been superceded by subsequent events. But here, the period of acts of parental omission or commission on the part of the father was succeeded only by three years of absence and silent. There are no facts that would therefore outweigh, supercede, or obliterate the grounds that existed in November of 1985. It is true that the statute appears to require such ground to have existed for a period of one year (see Appendix A as to whether such delay was intended by the legislature to apply to this particular ground for terminating parental rights), but on the facts in this record (1) the totality of the circumstances surrounding the child requires that the court waive the one-year requirement to promote the best interest of the child, and (2) a year of silence and absence having followed the month of negative behavior of the father in relation to this child, it is held that the necessary year has, in fact, elapsed.
(3) Absence of parent-child relationship: It was unnecessary for the court-ordered clinical evaluator to see the interaction between the respondent and the child for him to conclude there could be no existing parent-child relationship. That a child of nearly five who has not lived with his father since the age of one month and has not seen him since the age of nine months can have no ongoing parent child relationship with that parent is a conclusion that layman could reach. In Re Juv. Appeal (Anon), 131 Conn. 638, 645 (1980). The lack of such relationship alone, however, is not grounds to terminate a parent's parental rights. The court must also find by equally clear and convincing proof that
 . . .to allow further time for the establishment or reestablishment of the parent child relationship would be detrimental to the best interests of the child.
Dr. Freedman was exhaustively cross-examined on this subject and testified unequivocally that re-introduction of the biological father when the child is six or seven years old could have only detrimental consequences for the child. The CT Page 3839 fact that the father, during his sobriety while incarcerated, interacted appropriately with a niece of comparable age with whom he was well acquainted is irrelevant to this conclusion. The record is devoid of any evidence to suggest any possible benefit to this child from being introduced to a "real" father whom he does not know and for whom the prognosis for lasting rehabilitation from a life of drug abuse, crime, violence and self-indulgence is "pretty slim". It is therefore found by clear and convincing evidence that any further delay in establishing a parent-child relationship between this child and his biological father will be detrimental to the best interests of the child. (Id., p. 646.)
Disposition — on facts as of final day of hearing (7/18/90)
Before a court may consider the ultimate best interests of a child in this proceeding it must consider the six factors set forth in subsection (h) of Sec. 45-61f:
(1) No services were offered or provided to the father by any agency to facilitate reunion of the child with the parent. Indeed, reuniting Mark R. with his biological father has never been the objective of even the respondent in this action. Further, no agency was ever involved in the life of this child except the Department of Income Maintenance during the period immediately after the parties separated, due to the father's unwillingness or inability to pay child support. (2) No court orders were entered in this case except in connection with the divorce decree. Under pendente lite orders, the respondent was permitted two-hour weekly visitation. He, in fact, only exercised his right to visit about one-quarter of the time. Under the final judgment of dissolution he was denied all visitation. He complied with this order, as he did with the order to cooperate with the clinical evaluation by this court. (3) The feelings and emotional ties of Mark R. with respect to his step-father are clear and unequivocal: Joseph D. has become as much of a parent to this little boy as is his biological mother. (4) Mark R. was nearly five at the time of the final hearing. He will be entering the world beyond home for the first time when he enters public school as a kindergartner this year. Anything that threatens the security of that home could undermine his adjustment to that wider world or the rest of his life. Reintroduction of the biological father, which might have been accomplished without undue trauma when the child was an infant or toddler, could have an effect on a six or seven year old that the psychologist CT Page 3840 termed "devastating" and "shattering". (5) Prior to his most recent prolonged incarceration, Mark C. made no apparent effort to "adjust his circumstances, conduct, or conditions to make it in the best interest of the child to return him to his home in the foreseeable future." It is questionable if his present state of sobriety within the maximum security prison will sustain upon his release. Certainly during the two years between the parents' separation and the beginning of this current incarceration, Mark C. only accelerated the pattern of drugs and violence that resulted in the order of no visitation entered in the divorce judgment. Both before and after his incarceration, Mark C. made no effort to maintain contact with the child or the petitioner, although he was fully aware that he could seek free legal counsel in an attempt to modify such order. (6) Deborah admittedly did all she could to prevent Mark C. from having any kind of relationship with this child following their divorce. Not only was this consistent with a valid and unappealed order of the court entered in the divorce judgment, but it was also reasonable to ensure the child a safe predictable, nurturing environment with his mother and stepfather.
Having duly considered the foregoing, it is found to be clearly and consistently in the best interest of this child for his biological father's parental rights to be terminated so that he may be adopted forthwith by his stepfather — the only "Daddy" he has ever known and the biological father of his baby brother.
Judgment
It is therefore ORDERED that the parental rights of Mark C. in and to the child Mark R. be, and hereby are, terminated. Pursuant to subsection (i) of Sec. 45-61f, this leaves the petitioner herein the sole parent and guardian of the person of the child, and as such may pursue a stepparent adoption by her present husband under the provisions of Sec. 45-61i, subsection (2)(D).
Entered at Plainville this 2 day of November 1990
Brenneman, Judge.
APPENDIX A
 Legislative history of the one-year requirement for grounds to terminate parental rights. CT Page 3841
The Superior Court, sitting on petitions coterminously filed under subsection (e) of Sec. 17-43a, is required to act under the provisions of Sec. 45-61f applicable to children not previously committed to the state. An examination of the legislative history of Connecticut's two termination statutes makes clear that the one-year requirement in Sec. 45 61f was never intended to apply to any nonconsensual ground for terminating a parent's rights other than abandonment.
The original legislation conferring on the probate court's jurisdiction to terminate parental rights and on the then Juvenile Court jurisdiction to hear simultaneously filed neglect and termination petitions, P.A. 73-156, imposed the one-year requirement on all nonconsensual grounds as had historically existed in Juvenile Court affecting rights of parents of previously committed children. The following year, among many amendments to the original legislation effected by P.A. 74-164, the location of the one-year requirement was moved so that it applied to abandonment only. In explaining the intent of the amendments, the Probate Court Administrator, who had chaired the task force which had proposed the original 1973 legislation, testified that the 1974 changes were intended to permit the Juvenile court ". . . . to terminate the parental rights using the same standards as the probate court on a child committed to the welfare commissioner WITHOUT WAITING THE YEAR REQUIRED UNDER THE OLD STATUTE." (Hearing, March 19, 1974, p. 195. Emphasis added.) As enacted, however, the one-year requirement was retained in Sec. 17-43a for petitions concerning children previously committed to the state (Sec. 3 of P.A. 74-164) but eliminated for all other termination petitions originating in either court, except where abandonment was alleged.
Changes made in these statutes nearly every year thereafter left unchanged the distinction between termination petitions affecting committed children, for which the one-year requirement continued to apply, and those affecting children not previously committed, for which the one-year requirement was confined to abandonment.
In 1983, however, in P.A. 83-478, the legislature for the first time added to the "acts of commission and omission" ground the second sentence now found there:
 Nonaccidental or inadequately explained serious physical injury to a child shall constitute prima facie evidence of acts of parental commission or omission sufficient for the termination of parental CT Page 3842 rights.
At the same time, in an apparent effort to erase the differences between the two statutes despite the very different contexts to which they applied, the one-year requirement was again moved to a position where, as in Sec. 17-43a, it became equally applicable to all of the nonconsensual grounds. When presented to the House of Representatives as Amendment A to the 1983 legislation, there was no discussion or apparent consideration of the impact of applying the one-year requirement to all of the the grounds in Sec. 45-61f, including the important addition of "serious physical injury" as prima facie ground, encompassed within "acts of commission or omission," sufficient alone to terminate a parent's rights. The only hint in the legislative history that anyone even considered the impact of this change (other than to achieve the beauty of symmetry between the two statutes) was a letter to the Judiciary Committee from a spokesperson from the Legal Services Training and Advocacy Project dated May 11, 1983 opposing the suggestion that had been made that the one-year requirement be deleted from all termination laws. He added, in passing, that the requirement should, instead, be added to Sec. 45-61f so as to give all parents the opportunity to rehabilitate before any court could terminate their rights. Two weeks later this suggestion was introduced to the House of Representatives, without discussion, as a "technical amendment" and passed without debate. (Journal of the House, May 25, 1983, p. 272.) This and all other changes enacted by P.A. 83-478 were inadvertently repealed by Sec. 2 of P.A. 83-11 (June Special Session) and reenacted without debate by Sec. 6 of P.A. 84-171 the following year.
This legislative history shows a conscious intent in 1974 to limit the one-year requirement to abandonment only, but appears to be an inadvertent restoration of the requirement to all of the other grounds as a "technical amendment" nine years later.